Samuel Washington
AZ State Bar No. 22749
Law Offices of Samuel Washington
PO Box 1666
Tucson, AZ 85702
Phone(520) 288-4688
Fax (866) 736-4706
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>PLAINTIFF<br><br>v.<br><br>Ahmed Maqbul Syed,<br><br>DEFENDANT | Case No. CR 24-08825-JCH-LCK<br><br>MOTION TO CONTINUE SENTENCING HEARING |

COMES NOW, Defendant Ahmed Maqbul Syed, by and through his attorney, Samuel A. Washington, and submits the following objections to the Presentence Investigation Report:

**INTRODUCTION**

The United States Probation Office issued its draft Presentence Report ("PSR," hereinafter) in this case on July 10, 2026. Due to the complex nature of the issues involved, Defendant Ahmed Maqbul Syed ("Syed" or "Defendant," hereinafter) was granted an extension to present these objections until September 2, 2026.

The PSR contains numerous errors that increase the United States Sentencing Guidelines ("USSG" or "Guidelines," hereinafter) range applicable to Syed in this case and the amount of restitution owed. These errors largely stem from the PSR's incorrect assertion at the outset that Syed agreed to the Government's asserted total loss amount. As detailed herein, Syed is not precluded in the Plea Agreement from contesting the Government's asserted loss amount and submits that the correct total loss amount attributable to Syed under USSG §§1B1.3 and 2B1.1(b) is approximately $985,672.53, resulting in an adjustment of 14 levels, not the 16-level adjustment asserted in the PSR. The applicable restitution amount attributable to Syed is $584,798.31. In arriving at substantially higher loss amount and restitution figures, the Government and the PSR author erroneously attribute conduct of other individuals, known and unknown, to Syed without establishing the conduct of those other individuals constitutes "relevant conduct" under USSG §1B1.3. The discovery provided likewise does not support the assertion that this conduct of other individuals constitutes Syed's "relevant conduct" under USSG §1B1.3.

Syed further objects to the two-level adjustment for misrepresentation that the defendant was acting on behalf of a government agency under USSG §2B1.1(b)(9)(A) because the alleged misrepresentations by other individuals were not known or reasonably foreseeable to Syed.

**OBJECTIONS.**

1. Syed objects to paragraph 6 because it erroneously asserts, "[t]he parties agree that restitution shall be capped at $5,000,000 and Syed shall be held accountable

for approximately $2.6 million in intended loss." The Plea Agreement provides that the total loss "will be determined by the court at sentencing" and that Syed "understands that the government's position is that he should be held accountable for approximately $2.6 million in intended loss." Nowhere in the Plea Agreement did Syed agree to the Government's position regarding the loss amount or waive his right to contest the asserted amount.

2. Syed objects to paragraph 9 because it incorrectly asserts Syed "ran" the tech support scheme. Syed did not run the scheme and was not involved in the tech support aspect of the scheme. Syed's involvement in the scheme was limited to managing four couriers, namely, Rupesh Chintakindi ("Chintakindi," hereinafter), Akhil Boya ("Boya," hereinafter), "Yassim," and "Mosim," who would pick up money and cash from victims under specific instructions provided to him by the operators of the scheme. Syed also on occasion assisted his cousin Imran Shaikh ("Shaikh," hereinafter) and another courier named Muzammil Ali, who both generally worked under a different courier manager known as "Ali," in connection with pickups and drop-offs of victim's assets.

3. Syed objects to paragraphs 10 – 16, 26 – 28, 30 – 39, 42 – 43, 45 – 47, 49, 51 – 52, 54, 57, 61, and 63 because they characterize events as Syed's "offense conduct" despite the noninvolvement of Syed or any of the four couriers who worked under him in the events described. These paragraphs are included as Syed's "offense conduct" despite the lack of allegations, much less supporting evidence, that Syed or his couriers were involved in the events described. To the extent these paragraphs imply Syed or the four couriers who worked for him were involved in the events described, this implication is

not supported by the discovery provided. Because Syed and his couriers were not involved in the events described in these paragraphs, the PSR erroneously includes descriptions of these events as Syed's "offense conduct" and erroneously implies Syed's involvement and/or the reasonably foreseeable involvement of other individuals within the scope of Syed's agreement to participate in the scheme. *See, e.g., United States v. Lloyd*, 807 F.3d 1128, 1142 (9th Cir. 2015) (holding the loss amount adjustment under the Guidelines is limited to losses "within the scope of the defendant's agreement with his co-conspirators and [that were] reasonably foreseeable to the defendant," so the district court erred in treating activities of one group involved in a telemarketing scheme to another group) (applying USSG §1B1.3(a)).

4. Syed objects to paragraph 17 because it incorrectly asserts the counterfeit package used in the May 2, 2024, controlled delivery contained $250,950. The discovery provided states the counterfeit package used in the controlled delivery contained gold bars valued at $250,934.22.

5. Syed objects to paragraph 18 because it incorrectly asserts "[t]he amount of restitution to M.D. totaled $770,458.78, with the intended loss amount of $1,021,393." Of the transactions relied upon to arrive at those amounts, Syed and his couriers were involved only in the May 2, 2024, controlled delivery described in paragraph 17, in which Syed and his courier attempted, but failed, to obtain $250,934.22. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the amount of restitution to M.D. totals $0, with an intended loss amount of $250,934.22.

6. Syed objects to paragraph 32 because it incorrectly asserts, "[t]he total intended loss for the victim M.P. was $120,940 as the 46 ounces of gold were returned." The total loss is $20,940, which included the amount of gold returned to the victim." Of the transactions relied upon to arrive at those amounts, Syed and his couriers were involved only in the May 1, 2024, transaction described in paragraph 29, in which courier Chintakindi picked up 46 ounces of gold, valued at $109,940, which was subsequently returned to M.P. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the total intended loss was $109,940, and the total actual loss was $0.

7. Syed objects to paragraph 40 because it incorrectly asserts "S.S. total loss was $60,000 and intended loss was $46,000." First, the PSR appears to have incorrectly allocated the transactions between actual and intended losses. S.S. lost $6,000 and then a second transaction in which an unidentified individual who was not Syed or one of his couriers sought $60,000 was interrupted by a law enforcement sting. The following day, Shaikh sought to obtain an additional $40,000 when he was intercepted and arrested. Thus, the total for S.S., including both relevant and irrelevant conduct, was $6,000 in actual losses and $100,000 in intended losses. Second, of the transactions regarding S.S., Shaikh, driving a vehicle registered to Syed, was only involved in the thwarted $40,000 transaction. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the total actual loss was $0 and the intended loss was $40,000.

8. Syed objects to paragraph 50 because it incorrectly asserts "[t]he total loss for S.W. and B.W. was $234,179." Of the transactions relied upon to arrive at those amounts, Syed and his couriers were involved only in the April 11, 2024, transaction

described in paragraph 44 and the April 15, 2024, transaction described in paragraph 48, in which couriers Chintakindi and Boya, respectively, picked up $50,000 and $39,000 in cash, respectively. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the total loss was $89,000.

9. Syed objects to paragraph 55 because it incorrectly asserts "[t]he total loss amount to victim Y.G. was $165,563.36." Of the transactions relied upon to arrive at this amount, Shaikh, driving a vehicle registered to Syed, was only involved in the February 15, 2024, transaction in which he picked up gold bars valued at $97,963.36 and the February 29, 2024, transaction in which he picked up $38,000 in cash. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the total loss was $135,963.36.

10. Syed objects to paragraph 64 because it incorrectly asserts "C.W. had a total loss amount of $711, 651.82." First, the amounts provided in paragraphs 62 and 63 add up to $662,787.87, not $711,651.82. The PSR appears to have omitted an April 12, 2024, transaction in the amount of $48,863.95. Second, of the transactions relied upon to arrive at those amounts, Syed and his couriers were involved only in the February 13, 2024, transaction described in paragraph 62, in which courier Chintakindi picked up gold bars from C.W. valued at $47,971. Syed and his courier Chintakindi were also involved in the omitted April 12, 2024, transaction in the amount of $48,863.95. When restricted to Syed's relevant conduct under USSG §1B1.3(a), C.W.'s total loss is $96,834.95.

11. Syed objects to paragraph 65 because it incorrectly asserts the Syed "directed Imran Shaikh (Syed's cousin), courier Akhil Boya, Rupesh Chandra Chintakindi, OW, Victor Frankie, Andrew Katsaros, Andrew Cannarsa and Rebecca

actioning [sic] as agents from the FTC or IRS." Of the individuals listed, Syed only ever directed Chintakindi and Boya, and Shaikh on occasion, in the course of the fraudulent scheme. The other named individuals acted separately from Syed and/or higher up in the scheme. Syed did not participate in any capacity in the impersonation of FTC or IRS agents, nor did he ever direct such conduct. Syed's involvement in the scheme was limited to managing four couriers, namely, Chintakindi, Boya, Yassim, and Mosim, who would pick up money and cash from victims under specific instructions provided to him by the operators of the scheme. Syed also on occasion assisted Muzammil Ali and Shaikh who generally worked under a different courier manager known as "Ali."

12. Syed objects to paragraph 67 because it incorrectly attributes a total loss of $2,250,852.96 and intended loss of $2,651,727.18 to Syed. When restricted to Syed's relevant conduct under USSG §1B1.3(a) as described above, the correct amounts are as follows:

| **Victim** | **Loss Attributable to Syed** | **Intended Loss Attributable to Syed** |
|---|---|---|
| M.D. | $0 | $250,934.22 |
| M.P. | $0 | $109,940 |
| Y.G. | $135,963.36 | $135,963.36 |
| L.F. | $48,000 | $48,000 |
| S.S. | $0 | $40,000 |
| S.W. & B.W. | $89,000 | $89,000 |
| C.W. | $96,834.95 | $96,834.95 |
| H.W. | $215,000 | $215,000 |
| | | |
| **TOTAL** | $584,798.31 | $985,672.53 |

13. Syed objects to paragraph 69 because it incorrectly attributes to Syed the conduct of other individuals that does not constitute Syed's relevant conduct under USSG §1B1.3(a). Paragraph 69 incorrectly claims "defendant" had repeated telephone conversations with Y.G. in connection to the fraud scheme. Syed never spoke with Y.G. and was never involved in communicating with fraud victims. Syed was not involved in any capacity in the tech support or government imposter aspects of the scheme, which were handled entirely independently from him and his couriers. Syed's involvement was limited to managing couriers, and Syed's couriers were not involved, or alleged to be involved, in the transactions involving Y.G.

14. Syed objects to paragraph 70 because it incorrectly claims "[t]he defendant kept the victim on the phone for hours, even days" and wrongly attributes the threats and manipulation of other individuals to Syed. As set forth above, Syed never spoke with Y.G. or any other victims and was not involved in that aspect of the scheme.

15. Syed objects to paragraph 71 because the conduct described is not relevant conduct attributable to Syed.

16. Syed objects to paragraph 72 because it incorrectly asserts "**Syed** was the individual that picked up the money." As stated in paragraph 17, it was Chintakindi, not Syed, who picked up the money in the controlled delivery.

17. Syed objects to paragraph 81 because it adds 16 levels to the base offense level based on an asserted loss amount of more than $1,500,000, specifically a loss amount of $2,250,852.96. The true intended loss amount attributable to Syed is $985,672.53, resulting in a 14-level adjustment under USSG §2B1.1(b)(1)(H).

18. Syed objects to paragraph 83 because it adds two levels under USSG §2B1.1(b)(9)(A) for misrepresentation that the defendant was acting on behalf of a government agency. First, Syed objects to this adjustment because the other individuals acting as government agents did not misrepresent that they were "acting to obtain a benefit on behalf … a government agency." USSG §2B1.1, cmt. n. 8. Instead, they misrepresented that they were collecting these assets to obtain a benefit for the victims, i.e. to protect their assets from other fictitious scammers. *See United States v. George*, 713 F. App'x 704, 704–05 (9th Cir. 2018) (unpublished) (no adjustment under USSG §2B1.1(b)(9)(A) was warranted because the conduct at issue did not amount to a representation "that the defendant was acting to *obtain a benefit* on behalf of ... a government agency ... when, in fact, the defendant intended to divert all or part of that benefit (*e.g.*, for the defendant's personal gain).") (original emphasis) (citing USSG § 2B1.1 cmt. n.8)). Second, Syed objects to this adjustment because other individuals posing as government agents was not reasonably foreseeable to him or within the scope of the agreement he made to join the conspiracy, as his role was limited to managing couriers and he did not have involvement in or substantial knowledge regarding the other aspects of the scheme. *See United States v. Petty*, 992 F.2d 887 (9th Cir. 1993) (defendants are responsible under the Guidelines only for those aspects of a conspiracy that are reasonably foreseeable to the particular defendant and within the scope of the particular agreement each defendant made to join the conspiracy) (citing USSG. §1B1.3, cmt. 1).

19. Syed objects to paragraph 87 because it asserts an adjusted offense level of 34, whereas the adjusted offense level based on the prior objections asserted herein is 30.

20. Syed objects to paragraph 91 because it asserts a total offense level of 31, whereas the total offense level based on the prior objections asserted herein is 27.

21. Syed objects to paragraph 110 because it understates his present health issues. Syed has been diagnosed with stage II chronic kidney disease, type 2 diabetes mellitus, hypothyroidism, primary hypertension, deep venous thrombosis, mixed hyperlipidemia, and gastroesophageal reflux disease.

22. Syed objects to paragraphs 117 and 118 because they incorrectly assert "[s]ince 2012, until his arrest in the instant offense, Syed was employed at Cistco Mobile gas station as the Manager in Oswego Illinois," and that he worked at two other gas stations before that. Syed has not worked at the Citgo Mobile gas station since 2012. Syed arrived in the United States in 2012. He initially worked at Cliff Mobile Gas Station in Aurora, Illinois, from approximately 2012 until 2015, then worked at the Mobil Gas Station in Aurora, Illinois, from approximately 2015 until 2022, then worked as a Manager at the Citgo Mobile gas station in Oswego, Illinois, from 2022 until his arrest.

23. Syed objects to paragraph 119 because he did not only work as a border patrol officer in Qatar in 2006. He worked as a border patrol officer in Qatar from 2006 until approximately 2011 or 2012, when he moved to the United States.

24. Syed objects to paragraph 127 because it calculates his Guideline range as 108 to 135 months based on a total offense level of 31, rather than a total offense level of 27. Based on a total offense level of 27 and a Criminal History Category of I, the guideline imprisonment range is 70-87 months.

25. Syed objects to paragraph 134 because it asserts a Guideline fine range of $30,000 to $300,000 under USSG §5E1.2(c)(3). Because the total offense level should be 27, not 31, the Guideline fine range under USSG §5E1.2(c)(3) is $25,000 to $250,000.

26. Syed objects to paragraph 136 because it asserts restitution is owed in the amount of $2,250,852.96, based on transactions that do not constitute Syed's relevant conduct under USSG §1B1.3. When restricted to Syed's relevant conduct under USSG §1B1.3(a), the correct restitution amount is $584,798.31, comprised of $135,963.36 to Y.G., $48,000 to L.F., $96,834.95 to C.W., $215,000 to H.W., and $89,000 to S.W. and B.W., as that is the full amount of actual loss attributable to Syed and his couriers based on the discovery provided.

27. Syed objects to paragraph 140 because it is premised on a total offense level of 31 and a Guideline range of 108 to 135 months. Under the correct total offense level of 27, Syed has a Guideline range of 70-87 months.

28. Syed objects to paragraph 142 because it incorrectly asserts there is no information concerning the offense or the defendant which would warrant a variance from the advisory guideline range. As will be detailed in full in Syed's sentencing memorandum, a downward variance is justified under the circumstances of this case for

reasons including Syed's initial ignorance of the fact he was participating in a fraud scheme, the lack of profit Syed personally derived from the scheme, Syed's medical condition and age, Syed's work history and demonstrated capacity to meaningfully contribute to society and obey its laws, and the extent to which rigid application of USSG §2B1.1's loss amount table would overstate Syed's culpability. *See* Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 618 (2021) (describing the shortcomings of §2B1.1's loss table and noting "[a]s a result of these problems with the design and operation of the loss table, a broad judicial consensus has developed that Section 2B 1.l's loss table overstates culpability in a great many cases"); Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform,* 102 lowa L. Rev. 939, 950 n.48 (2017) (("[A]s the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases.").

Respectfully submitted the 2nd day of September, 2026.



Samuel Washington