TIMOTHY COURCHAINE
United States Attorney
District of Arizona
JONATHAN B. GRANOFF
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: jonathan.granoff@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States America,<br><br>Plaintiff,<br><br>vs.<br><br>Ahmed Maqbul Syed,<br><br>Defendant. | CR 24-08825-JCH-(LCK)<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The government, by and through its attorneys, hereby files its sentencing memorandum in support of a lengthy prison sentence of 97-months. Such a sentence is warranted because the defendant was a manager and supervisor who participated in a sophisticated money laundering conspiracy derived from fraud proceeds of a transnational elder fraud organization targeting numerous elderly victims from around the United States. This sentence is justified because the defendant participated in the conspiracy over the course of several months. Defendant's participation is directly linked to at least nine separate elderly victims who lost a total of approximately $2.4 million dollars during the approximate time the defendant participated in the conspiracy. The fraud scheme in the underlying conspiracy was sophisticated. The fraudsters generally preyed on elderly and vulnerable victims through their computers in a pop-up freeze/tech support scam. The scammers led victims to call people the victims were falsely led to believe were acting on behalf of well-known tech companies. The scammers also used vicious and ruthless tactics

to defraud these victims out of their life savings. For example, the scammers falsely led some victims to believe that their accounts had been hacked and compromised and that the victims' accounts were linked to child pornography and other crimes. (E.g.., Draft PSR ¶¶ 10, 70, Government's Objections to PSR, pgs. 10-11) (Victims M.D., Y.G., C.W. and Video Deposition of Y.G. at pg. 20). At least one victim was threatened with arrest and told that all her assets would be confiscated if she did not comply. (E.g., Video Deposition of Y.G. at pg. 42-43). These vicious and ruthless tactics instilled fear in the victims, coercing them to comply with the scheme. (e.g. Video Deposition of Y.G. at pgs. 19-21, 36-37, pgs. 60-61, 76, 85).[1] Victims were lied to repeatedly and told that they had to convert their assets into gold and transfer their money and assets to people the victims were led to believe were acting on behalf of legitimate government agencies. The victims transferred away their life savings under the false belief that they were helping themselves or protecting their assets. The crimes defendant helped perpetrate, through his extensive laundering activities, had a devasting financial and emotional impact on elderly, vulnerable victims. Some victims lost most of their entire life savings to the scam. (e.g., Victim Impact statements of Y.G. and Victim C.W. (who suffered a $711,651 loss from the scheme) ("My entire life savings and investment is now gone. . . . Everything I have worked for to provide for my needs in the future is now gone . . ."). The evidence shows that the fraudsters also had the intent to defraud the victims out of most of their life savings. The aggravating factors in this case and the defendant's supervisory/managerial role in the sophisticated laundering activities that helped further this horrific scheme justify the significant prison sentence requested by the United States.

[1] The deposition of Victim Y.G. was provided to the Court in chambers. The FBI Task Force Officer's Power Point summarizing some of the evidence in this case was also submitted to the Court in chambers for the sentencing.

I. VICTIMS SUFFERED DEVASTING FINANCIAL LOSSES FROM THE SCHEME DEFENDANT HELPED FACILITATE.

Based on a relevant conduct assessment, the defendant is responsible for the total loss sustained to at least nine elderly victims set forth below. The defendant supervised, managed, or paid gold and money runners who retrieved fraud proceeds from each of the following victims. The victims' total loss, timeframe of loss, and age at the time of the scheme are set forth below:

| Name | Age During Scheme | Actual Loss | Date Range/Loss |
|---|---|---|---|
| Y.G. (IL) | 75 | $165,563.36 | 1/24/24 - 2/29/24 |
| L.F. (IN) | 64 | $48,000 | 2/23/24 |
| M.D. (AZ) | 74 | $770,458.78 | 2/23/24 - 5/2/24 |
| C.W. (MO) | 77 | $711,651.82 | 2/13/24 – 4/12/24 |
| M.P. (AZ) | 81 | $100,000 | 4/25/24 – 5/7/24 |
| S.S. (WI) | 67 | $6,000 | 3/21/24 |
| H.W. (TX) | 82 | $215,000 | 4/3/24 |
| B.W./S.W. (IL) | 64/65 | $234,179 | 4/2/24 – 4/15/24 |
| P.P. (TX) | 79 | $188,400 | 4/11/24 – 4/30/24 |
| Total Loss | | $2,439,252.96 | |

The financial impact on these elderly and vulnerable victims cannot be understated. It was severe. As indicated, 77-year-old Missouri victim C.W. lost her life savings (approximately $711,651) to the scam. (Victim Impact Statement C.W.). Additionally, after sustaining this huge loss, she had to deal with the IRS because she withdrew these funds from her retirement account and incurred a significant tax. She had to borrow an additional $150,000 to pay the income tax for the retirement funds. Other victims were in a similar position because of the scam. Arizona Victim M.D. withdrew large portions of the scam proceeds from her retirement account. After she lost a significant portion of her

savings, she also had to deal with the IRS. To address the tax problem, M.D. hired a lawyer to help pay back the IRS and additional money owed to the State of Arizona. (Victim Impact Statement of M.D.). Victim Y.G. also stated she had to pay $18,000 tax to the IRS after she withdrew money from her retirement account because of the scam. (Y.G. deposition at pg. 102-103). As indicated, Y.G. also lost most of her life savings because of the scam. (Y.G. deposition at pg. 104). Victim B.W. is another victim who indicated that she lost most of her and her husband's life savings from the scam. (Victim Impact Statement, B.W.). The devasting financial impact on these elderly victims is an aggravating factor the Court should consider in sentencing.

## II. THE EMOTIONAL AND PSYCHOLOGICAL IMPACT OF THE SCAM ON ELDERLY, VULNERABLE VICTIMS ARE AGGRAVATING FACTORS THE COURT SHOULD CONSIDER BEFORE IMPOSING SENTENCE.

In addition to the devasting financial loss sustained by many of the elderly victims, the scam had a significant emotional and mental impact on the victims. Y.G. emphasized the emotional impact of the scam during her video deposition. (Y.G. Deposition at pg. 107). Y.G. believed that she was under constant monitoring of her phone. (*Id.* at pg. 108-109). The scammers placed her in fear. Y.G.'s notes she documented relating to the scheme provide additional details of the scheme's impact. (**Exhibit 1, Attached** (*Exhibit 21* from the Deposition of Y.G.)). Y.G.'s notes also document how the scammers would speak to the victims about the extent of their assets so the scammers knew how much they could obtain from the scam. (Exhibit 1 at pg. 6). Victim B.W. stated that she had "experienced sleepless nights, stress, anxiety and fear of being taken advantage of again[.]" (Victim Impact Statement, B.W.). In Victim M.D.'s impact statement, she documented that she has had "continuing anxiety and edginess since this scam happened to [her]." (Victim Impact Statement, M.D.). Victim L.F. stated that what happened to her was so embarrassing that she didn't want to speak about it. (Video Deposition of L.F. at pg. 58). These are examples

of the extreme psychological impact on vulnerable, elderly victims who sustained significant financial loss because of the scam.

## III. THE SOPHISTICATED NATURE OF THE MONEY LAUNDERING ACTIVITIES THE DEFENDANT PARTICIPATED IN SHOULD BE CONSIDERED AN AGGRAVATING FACTOR.

The defendant's role in this offense and sophisticated nature of his money laundering operation are aggravating factors. The criminal network the defendant was a part of was sophisticated. The network operated across many States. Couriers traveled around the country and used rental cars. The operation scammed victims to convert their assets to gold in part to further the money laundering operation. The co-conspirators sent numerous couriers to retrieve the gold from the victims in various States. The gold and other fraud proceeds could not be successfully traced in this criminal investigation. The only gold that was recovered relating to the defendant's victims was the 46 ounces of M.P.'s gold found hidden in Rupesh Chintakindi's vehicle after his arrest. The money laundering operation the defendant participated in used other methods to help launder the proceeds to include requiring victims to purchase gift cards (and transferring the gift card numbers), crypto currency transfers used for victim M.P., and other cash deliveries. Different couriers or runners were also often used to retrieve the gold and cash to make it more difficult to trace the fraud proceeds. Couriers were provided with instructions and delivered the fraud proceeds once received from the victims to different individuals. One method used for delivery of the fraud proceeds after receiving them from a victim would be a one-dollar bill. The dollar bill serial number would be provided to the courier. The courier would also receive a contact number to call for further delivery instructions. After contacting the number, the courier would receive an address for the further delivery of the fraud proceeds with the dollar bill. Once arriving at the delivery location with the fraud proceeds, the courier would verify that the person receiving the fraud proceeds had the same dollar bill serial number for verification of the transfer. (**B. 3.0300 – 3.0301**). The

money laundering organization also used burner phones to facilitate their laundering activities. Defendant's role as a manager/supervisor level, knowing participant for this sophisticated money laundering operation of elder fraud proceeds is a significant, aggravating factor in this case.

## IV. THIS COURT'S SENTENCE MUST BE SUFFICIENT TO *DETER* OTHER FRAUDSTERS AND MONEY LAUNDERERS WHO HELP FACILITATE FRAUD SCHEMES TARGETING THE ELDERLY.

In sentencing the defendant, some of the factors this court must consider are the need for the sentence to: (1) reflect the seriousness of the offense; (b) promote respect for the law; (c) and provide just punishment. 18 U.S.C. §3553(a). The sentence must also afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. Financial exploitation of the elderly in the United States is a serious and growing concern. The nation's elderly population is rapidly expanding. According to the 2020 census statistics, about 1 in 6 persons in the United States are 65 years or older. https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html. Going back 100 years to 1920, less than 1 in 20 people were in this age group. *Id.* The potential victim pool for those who seek to financially exploit and defraud the elderly is expanding. The graph on the following page, copied from the United States Census Bureau web site, reflects the significant increase in our nation's elderly population over time. The elderly population continues to expand.

Figure 1.
**Population 65 Years and Over by Size and Percentage of Total Population: 1920 to 2020**




Note: For information on data collection, confidentiality protection, nonsampling error, and definitions, refer to <https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/demographic-and-housing-characteristics-file-and-demographic-profile/2020census-demographic-and-housing-characteristics-file-and-demographic-profile-techdoc.pdf>.

Source: U.S. Census Bureau, Decennial Census of Population, 1900 to 2000; 2010 Census Summary File 1, and 2020 Census Demographic and Housing Characteristics File (DHC).

Further, the impact of financial exploitation of the elderly has only significantly worsened over the years. The below-graph derived from the Federal Bureau of Investigation's 2025 Internet Crime Report reflects the significant impact from scams against the elderly throughout the last several years. Documented cases of fraud and fraud loss against the elderly have also exponentially grown over time. (https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf)




[17] Accessibility Description: Describes Elder Fraud highlights: 201,266 complaints (37% increase from 2024); $7,748 billion losses (59% increase from 2024); $38,500 average loss; 12,444 complainants lost more than $100K.
[18] Accessibility Description: Chart describes counts and losses for those reporting as 60+ from 2018 to 2025. Please see Appendix B and C for additional information related to IC3 complaint data, crime types, and descriptors.

Financial frauds against the elderly are also difficult cases to prosecute. Often, elderly victims are unavailable to testify because of significant, deteriorating mental health conditions or because, as in this case, victims have passed away. Additionally, these fraud cases take tremendous time and resources to investigate and prosecute. Detailed, thorough, and lengthy criminal investigations are often required such as in this case. Those who perpetrate frauds against the elderly are often difficult to catch. Further, and often, these elder fraud cases go unreported due to a variety of factors to include embarrassment and shame. The fraudsters who financially exploit the elderly understand these cases are difficult to prosecute. For these reasons, a significant prison sentence is required to deter others from participating in or helping to further similar schemes. This Court’s sentence

must serve as an impact to deter others from helping to facilitate these horrific acts of fraud against one of the more vulnerable segments of our population, the elderly.

Respectfully submitted this 16th day of October 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*/s/ Jonathan B. Granoff*

JONATHAN B. GRANOFF
Assistant U.S. Attorney

Copy of the foregoing served electronically or by other means this 16th day of October 2026 to:

Counsel for Defendant via ECF

U.S. Probation Office